UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

UNITED STATES OF AMERICA

v.

ALEX TAYLOR FONTENOT

Defendant

2:26-cr-00044-01
JUDGE CAIN
MAGISTRATE JUDGE LEBLANC

**MEMORANDUM IN OPPOSITION OF DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

NOW INTO COURT comes the United States of America, through the undersigned counsel, who submits its opposition to the motion to dismiss filed by the defendant, Alex Taylor Fontenot. On August 27, 2026, the defendant moved to dismiss the single-count indictment on two grounds. First, she argues that her threats were protected political speech under the First Amendment. [Doc. 33-3, p. 9]. Second, she argues that indictment should be dismissed for failure to state an offense, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v). *Id.* at p. 19. Both arguments fail for the reasons set forth below. In summary, recent Fifth Circuit precedent requires this Court to allow a jury to determine if Fontenot's statement was a "true threat."

## I. PROCEDURAL BACKGROUND

On January 30, 2026, Fontenot was charged via criminal complaint with one count of making threats in interstate commerce, in violation of 18 U.S.C. § 875(c). [Doc. 1]. On January 30, 2026, the arrest warrant for Fontenot was returned as

executed. [Doc. 4]. Her initial appearance was held on February 4, 2026. [Doc. 10]. On that same day, Fontenot was indicted and charged by a grand jury with one count of making threats in interstate commerce, in violation of 18 U.S.C. § 875(c). [Doc. 15]. Fontenot remains out-of-custody with a pending trial date of December 7, 2026. [Doc. 30].

## II. Factual Background

The charges in this case stem from a one minute and fourteen-second video that the defendant Alex Fontenot posted online with the following message:

> Hey ICE, guess what. This message is for you. Don't come to my house if you're planning on leaving alive. I'm fucking crazy. You step foot into my house, you're leaving in a body bag. I've been waiting for the day that I get to pew-pew a tyrannical government uprising. And guess what. My dad just pew-pew'd and murdered my mom. So I have all this built up rage and anger. You come to my house you'll actually be helping me aim it in a positive direction. Don't worry. No one will get hurt. You'll be dropped like flies immediately. You won't feel a thing. The GOP had ample opportunities to abolish the Second Amendment before they realized that what they're doing is going to cause a revolution from the American people against the tyrannical government. So come to my house, please, I beg you. I beg you. I beg you. Cause you're not leaving. It'll actually be very therapeutic for me. My therapist did recommend that I find a hobby or a healthy outlet to release my pent-up rage and anger into. So ICE if you walk into my house, count your fucking days because you're turning into my hobby. [Inaudible] this goes out to you for helping me find my next outlet.

*See* attached Government Exhibit 1.

The dialogue above is a word-for-word recitation of Fontenot's oral video statements from a January 25, 2026 post found on Fontenot's Instagram and TikTok pages. The video is titled: Don't come to my door expecting to leave freely. #fuckice

#abolishice #tyranicalgovernment #revoution2026 #impeachtrump. Fontenot is clearly identifiable as the speaker in the video.

These statements were first discovered by law enforcement when the Lake Charles Police Department ("LCPD") received a "Tip411" from an anonymous source.[1] The source stated that Fontenot was an employee at Lake Charles Memorial Hospital and was making verbal threats against federal agents. [Doc. 1]. Agents subsequently learned that Fontenot had not worked at the Lake Charles Memorial Hospital since July of 2025. *Id.*

The anonymous tipster attached a link to Fontenot's public Instagram post where she made the statements at issue. Agents discovered that the threatening post was a video of Fontenot looking into the camera, saying the words transcribed above, with music playing in the background. *Id; see also* attached Government Exhibit 1. The post was uploaded on January 25, 2026—two days before law enforcement officials became aware of it. *Id.* The profile name was "alexfontenot" with a profile picture appearing to be the same woman in the post itself. *Id.* A check of Fontenot's Louisiana driver's license listed her address in Lake Charles, Louisiana. *Id.*

## III. ARGUMENT

The First Amendment provides the default rule regarding the Government's ability to regulate an individual's speech. The Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Speech is therefore protected with the exception of a few categories often referred to as

[1] According to their website, Tip411 is a web-based tool that allows individuals to anonymously submit a tip about potential criminal activity to law enforcement agencies.

"unprotected speech." *Virginia v. Black*, 538 U.S. 343, 358 (2003). "True threats" are one such category of unprotected speech. *Id.* at 359. "True threats" are statements made by a speaker who means to "communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *United States v. Burger*, 170 F.4th 395, 401 (5th Cir. 2026) (citing *Black*, 538 U.S. at 359).

The analysis for determining what is and what isn't a "true threat" involves both subjective and objective components. Courts instruct that a "true threat" is one that (1) an objectively reasonable person would interpret as a "serious expression of an intent to cause a present or future harm"; and (2) one in which the "speaker was subjectively aware of [the statement's] threatening nature." *United States v. Jubert*, 139 F.4th 484, 490–91 (5th Cir. 2025) (cleaned up). The law does not require the speaker to actually intend to carry out the threat. *Burger*, 170 F.4th at 401 (citing *Black*, 538 U.S. 359–60).

*Black* provides three reasons why courts place "true threats" into the realm of unprotected speech. First, outlawing "true threats" protects individuals from the fear of violence. *Black*, 538 U.S. at 360. Second, it protects individuals from "the disruption that fear engenders." *Id.* Finally, prohibiting "true threats" protects people from the possibility that the threatened violence will occur. *Id.* (Adding that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.").

The defendant's motion must fail for four reasons. First, *United States v. Burger* holds that questions such as the one at issue regarding whether Fontenot's statement was a "true threat" must be decided by a jury. Second, the conditional nature of the statement does not prevent it from being a "true threat" nor does the fact that it addresses a category or persons rather than an individual. Third, contrary to the defendant's position, the acts described in the statement are not lawful acts—rather they are a promise that if an ICE agent knocked on her door, she would kill him or her. And finally, this case cannot be properly decided under Rule 12(b)(3)(B)—the indictment is sufficient as alleged, and the parties disagree as to whether Fontenot's statement is a "true threat."

A. *Burger* requires this Court to let the jury decide if the Defendant's statement was a true threat.

Whether Fontenot's statements are "true threats" is a fact issue. It is settled law that whether certain language communicates a "true threat" is a fact question solely for the jury. *United States v. Daughenbaugh*, 49 F.3d 171, 173 (5th Cir. 1995); *United States v. Howell*, 719 F.2d 1258, 1260 (5th Cir. 1983). "True threats are serious expressions conveying that a speaker means to commit an act of unlawful violence." *United States v. Jubert*, 139 F.4th 484, 490 (5th Cir. 2025) (citing *Counterman v. Colorado*, 600 U.S. 66, 74 (2023)) (cleaned up); *see also Virginia v. Black*, 538 U.S. 343, 359 (2003); *Brandenburg v. Ohio*, 395 U.S. 444, 447–48 (1969) (per curiam).

The controlling question is whether a reasonable recipient would interpret the language in the communication as a threat. *Daughenbaugh*, 49 F.3d at 173–74. "[A] statement can count as such a threat based solely on its objective content."

*Counterman*, 600 U.S. at 72; *see also Jubert*, 139 F.4th at 490 ("Speech is a true threat and therefore unprotected if an objectively reasonable person would interpret the speech as a serious expression of an intent to cause a present or future harm."). In determining whether a communication constitutes a "true threat," both the subjective reaction of the recipient and the context in which the communication was made are relevant to the inquiry. *See United States v. Myers*, 104 F.3d 76, 80 (5th Cir. 1997).

In this case, the Government can provide ample evidence that the Defendant communicated a "true threat." The plain language of Fontenot's social media post easily supports that she communicated a "true threat," as any reasonable person would interpret those words as a threat. *See United States v. Turner*, 960 F.2d 461, 463–64 (5th Cir. 1992) ("The plain language of the letter was sufficient to cause 'a reasonable recipient, familiar with the context of the communication, to interpret it as a threat.'"). Moreover, this Court can see and listen to Fontenot's tone, cadence, and emotions on the recording and judge first-hand whether a reasonable recipient would interpret the language as a threat when conveyed in such manner. *See* attached Government Exhibit 1.

More importantly, the context of the statements provides further proof of its nature as a "true threat." Fontenot posted her statement to her public Instagram account. She did so at a time that ICE agents saw an 8,000% increase in death threats against them and a more than 1,300% increase in assaults against them. Press Release, U.S. Department of Homeland Security, ICE Officers Face an 8,000% Increase in Death Threats Against Them and Their Families (Jan. 26, 2026),

https://www.dhs.gov/news/2026/01/26/ice-officers-face-8000-increase-death-threats-against-them-and-their-families.

On the objective front, it's important to note that an anonymous citizen saw and heard Fontenot's video oral statement and reported it to the authorities. "The reactions of the recipients of a threat can be useful in determining whether an objectively reasonable person would interpret a statement as a threat." *Burger*, 170 F. 4th 395, 405 (citing *Daughenbaugh*, 49 F. 3d at 173–74). So, here, it's clear that an objectively reasonable person would interpret the statement as a "serious expression of an intent to cause a present or future harm" because a person in fact reported the threat. *Jubert*, 139 F.4th at 490–91. That person believed the threat to be real enough to alert authorities on a platform used to alert law enforcement. If no one believed Fontenot's true threat, this case would have never been reported to local authorities and then to federal authorities. But someone thought the threat real enough to alert law enforcement officials. And that person had some measure of personal knowledge of Fontenot as he or she knew where Fontenot was employed. Also pertinent is the fact that Fontenot made the post on two different social media platforms—TikTok and Instagram—with law enforcement confirming that at least the Instagram post was public for all to see.

Granting the Defendant's motion would essentially be the Court resolving contested factual issues for both the objective and subjective inquiries of the "true threat" analysis. A disputed factual question still remains: whether the context of Fontenot's post would lead a reasonable person to believe that Fontenot was making

a political jest rather than expressing a sincere intent to commit violence. And what better way to resolve that question than with a jury of Fontenot's peers who will be instructed on the law and able to make their own determination of whether a reasonable person would believe the statement to be a threat. Here, like in *Burger*, the correct characterization of the context is disputed. The parties disagree as to how the context of Fontenot's message affects the "true threat" analysis—and that analysis would be materially incomplete without further evidence. *Burger*, 170 F.4th at 405.

The subjective intent of Fontenot is clear, she knew she crossed the line when she posted the video. At trial, the Government intends on putting forth evidence outside of the statement itself to show Fontenot's subjective intent. For example, in a February 3, 2026 jail call, Fontenot has a discussion with a male acquaintance about her case. During the conversation, the male tells Fontenot that she cannot "just say whatever [she] wants on social media. You gave up your right to free speech." Later in the call, the male tells Fontenot "I even said it when you showed me that. That's not something you can post online." Fontenot replies, "I know." The male goes on to say, "you have to watch what you're saying online 'cause you're hitting that border where it's hitting what you can't say online." *See* attached Government Exhibit 2 (The relevant statements begin around the 6 minute and 30 second mark).

It appears from the conversation that Fontenot's male acquaintance warned her that statements such as hers are prohibited speech. At least once during the calls, Fontenot acknowledges that her statement is not something that she can post

online. Also, the discussion leads one to believe that the male has cautioned Fontenot against making such statements in the past. For these reasons, *Burger* and accompanying Fifth Circuit precedent on "true threats" requires this Court to submit the "true threat" question to a jury.

B. The conditional nature of Fontenot's statements does not prevent it from being a "true threat" nor does the fact that it addresses a category of persons rather than an individual.

The case before the Court does involve a conditional statement with a group target audience, but time and time again courts have found both conditional statements and threats to large target audiences to be "true threats." Noticeably absent from the Defendant's memorandum is the Fifth Circuit's recent and on-point decision concerning conditional statements and their viability as "true threats." In March of this year, three days before the *Burger* decision was handed down, the Fifth Circuit decided *Muller*—a unpublished case in which the court once again reiterated that conditional statements can be true threats. *United States v. Muller*, No. 25-10429, 2026 WL 737343 (5th Cir. 2026). *Muller*—like this case— is a case that dealt with a conditional statement that goes beyond mere "political hyperbole." *Id.* at *2.

In *Muller*, the defendant Timothy Muller became upset with the decision to not charge Hunter Biden with what Muller believed to be viable additional crimes based on evidence on Biden's laptop. *Id.* at *1. Muller was able to locate the phone number of the FBI agent who investigated Biden online and subsequently called the agent. *Id.* Muller left a voicemail on the agent's phone saying that "Trump's gonna win the re-election, and then we're gonna f---cking go through the FBI and just start throwing

you into jail. Or you can steal another election, and then the guns will come out, and we'll hunt you . . . down and slaughter you like the traitorous dogs you are in your own f---cking homes." *Id.* Muller continued stating, "[w]e're going to slaughter your whole f---ing family." *Id.* Muller then sent text messages to the agent's phone that consisted of "How's the family? Safe?"; "We want you so bad we can f---king taste it." and "Did you … really think you were going to disenfranchise 75 million Americans and not die? Lol." *Id.*

The Fifth Circuit dismissed Muller's argument that his words did not constitute a "true threat" because they were conditional and merely expressed political dissent. *Id.* at *2. Citing *United States v. Daughenbaugh*, the Fifth Circuit ruled that Muller's words were furnished "no constitutional shield" just because they were accompanied by political rhetoric. *Id.* (citing *Daughenbaugh*, 49 F.3d 171, 174 (5th Cir. 1995)).

The case before this Court is akin to *Muller*. Fontenot's verbal statement goes beyond political hyperbole. Her tone was sinister and malicious, more like the defendant in *Muller* than in *Watts*. *See Muller*, at * 2. The *Muller* court refused to be persuaded that *Watts* was controlling by distinguishing the context between the two statements. *Watts*—a case almost 60 years old—dealt with a defendant who said, "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Watts v. U.S.*, 394 U.S. 705, 706 (1969). The defendant in *Watts* made an offhanded comment in protest of government policy *at a political rally*. *Watts*, at 708 (emphasis added). The defendant in *Muller* made a serious, targeted threat to an FBI agent.

The threat was specific although conditional. Clear and serious enough for the court to distinguish the threat from *Watts*. The case before the Court is the same—a clear, conditional statement that goes beyond political hyperbole.

Fontenot's threat cannot be protected because it was aimed at a group rather than a person. There is no doubt that "true threats" can be aimed at a category of persons rather than a single individual. *Burger* made it clear that threats against categories of individuals can be deemed "true threats." Although the target in *Burger* was vague in that it threatened "worshippers of the cross" and attendees at a music festival, the Court found that a "threat's lack of particularity is relevant only insofar as it tends to negate an assertion that an objectively reasonable listener would conclude that threatened violence will occur." *Burger*, 170 F.4th at 402 (citing *United States v. Perez*, 43 F.4th 437, 443–44 (5th Cir. 2022)).

*Perez* dealt with a defendant who was convicted under the terrorist-hoax statute after posting on Facebook that his cousin who had COVID-19 licked everything at a grocery store. *United States v. Perez*, 43 F.4th 437 (5th Cir. 2022). The Court applied a "true threat" analysis when confronted with the defendant's First Amendment as-applied constitutional challenge. Recognizing that "true threats" are an exception to the First Amendment's free-speech protections, the Fifth Circuit found the defendant's statements to be "true threats." *Id.* at 444. The Court ruled that the defendant was not saved by the fact "that his posts did not name 'a particular individual or group of individuals.'" *Id.* (citing *Black*, 538 U.S. at 359). The main goal of criminalizing "true threats" is to protect individuals from the fear of violence,

from the disruption that fear engenders, and from the possibility that the threatened violence will occur. *Id.* at 443–44. With this in mind, the Court found that "[n]one of [these] factors turns on whether a speaker names individuals or merely places them where those individuals are likely to be." *Id.* at 444.

The target audience here is narrower than the threats in both *Perez* and *Burger*. Fontenot threatens to kill any ICE agents that may step onto her property, i.e. she threatened committing murder. This is a specific threat to a specific category of people, not a broad reference to grocery shoppers or concert goers. Fontenot's threat was more precise and more targeted than *Perez* and *Burger*. And like *Perez* and *Burger*, Fontenot's statements are also "true threats."

C. The acts described in Fontenot's statement are not lawful acts—rather they are a promise that if an ICE agent knocked on her door, she would kill them.

Fontenot's oral video statement threatens unlawful activity. The defense argument that the acts Fontenot describes in her statement constitute lawful acts is quite a stretch. [Doc. 33-3, p. 16]. Homeowners are not at liberty to kill anyone that steps onto their property lawfully. There are a number of lawful reasons allowing law enforcement officers, including federal agents, to approach or even enter her house.

For example, federal agents can perform a knock-and-talk at an individual's home without a warrant. *Florida v. Jardines*, 569 U.S. 1, 8 (2013) (citing *Kentucky v. King*, 131 S.Ct. 1849, 1862 (2011) (An "[o]fficer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private

citizen might do.'")). Fontenot herself admits that she would kill an ICE agent that came to her door. The title of the video is "Don't come to my door expecting to leave freely." The statement goes on to discuss how these ICE agents would leave in a body bag and be killed so quickly that they would not feel a thing.

Another legally available way for agents to enter Fontenot's home is with a valid warrant. Rule 41 of the Federal Rules of Criminal Procedure gives federal agents an avenue to legally enter an individual's home by obtaining a search warrant. Fed. R. Crim. P. 41.

An arrest warrant for Fontenot would also allow federal agents—including ICE agents—to enter her home. *Payton v. New York* states that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect within." 445 U.S. 573, 603 (1980).

And there are of course exceptions to the Fourth Amendment's requirement protection against warrantless searches. Just this year, the Supreme Court held that law enforcement officials may enter a home without a warrant to render aid in response to a public safety emergency inside. *Case v. Montana*, 607 U.S. 107 (2026). In addition, the long established "hot pursuit" exception allows police to enter a private home without a search warrant when they are chasing a fleeing suspect. *Warden v. Hayden,* 387 U.S. 294 (1967). Furthermore, consent allows law enforcement agents to enter a home without a warrant. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

In sum, Fontenot's verbal threats would not be lawful if carried out. The defendant's assertions are preposterous. *See* [Doc. 33-3, p. 6] ("The one circumstance that would bring about the harm described is an unlawful entry into a private dwelling.").

D. This case cannot be properly decided under Rule 12(b)(3)(B).

The indictment in this case is more than sufficient. The language not only tracks the essential elements of the crime, but summarizes the threats that Fontenot made in her post. According to *Elonis* and *Morales*, the essential elements of an § 875(c) charge are (1) that the defendant knowingly transmitted a communication in interstate or foreign commerce; (2) that the defendant subjectively intended the communication as a threat; and (3) that the content of the communication contained a true threat to kidnap or injure. *United States v. Elonis*, 575 U.S. 723 (2015); *United States v. Morales*, 272 F.3d 284 (5th Cir. 2001).

Under Fifth Circuit precedent, an indictment is to be liberally construed as sufficient, "unless it is so defective that by any reasonable construction, it fails to charge an offense for which the defendant is convicted." *United States v. Alford*, 999 F.2d 818, 823 (5th Cir. 1993). The defense overstates the government's burden at the indictment stage. The government does not need to allege to whom the video was communicated, whether anyone in the named category saw it, or how anyone who saw it understood it.

In *United States v. Robin*, the Fifth Circuit noted that, "to allege a true threat, the exact wording of the threatening statement need not be set out in the indictment."

693 F.2d 376, 380 (5th Cir. 1982). "If, as here, the indictment sets forth the elements of the offense so as to fairly apprise the defendant of the charges against [her] and does not expose [her] to double jeopardy, it is sufficient." *Id.* at 380. The government's indictment does just that. It tracks the statutory language, references the defendant's subjective intent, and provides a determinate audience—ICE agents. *O'Dwyer* is not the closest Fifth Circuit case to this one. *See* [Doc. 33-3, p. 26]. The Fifth Circuit found the target audience in *O'Dwyer* to reach only "scoundrels". "Scoundrel" understandably encompasses an indeterminate group of people. But Fontenot's threats were targeted towards a determinate group of people—anyone who was an ICE agent.

That the government does not allege that an ICE agent received or viewed the threat is of no consequence. In fact, an ICE agent need not have viewed the threat for Fontenot's statement to be a "true threat." In *United States v. Morales*, a Houston high school student threatened to shoot and kill students at his school. *Morales*, 272 F.3d 284, 285 (5th Cir. 2001). However, no students from Morales' school heard or received the threat. Instead, Morales made the threat to a 26-year-old mother of two living in Washington. *Id.* The court ruled that Fifth Circuit precedent does not distinguish between whether the threat is made to the threatened party or to a third party. *Id.* at 288 ("Morales contends, however, that his statements cannot, as a matter of law, constitute a true threat because they were made to a random third party who had no connection with Milby High School. Our precedent does not allow for this distinction."). Furthermore, the threat in this case could have reached ICE

agents. Any ICE agent with an Instagram account could have seen Fontenot's public statement posted on her page. The threat remains whether heard by an ICE agent or not.

## IV. CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court deny the Fontenot's motion.

Respectfully submitted,

ZACHARY A. KELLER
UNITED STATES ATTORNEY

By: */s/ John W. Nickel*
JOHN W. NICKEL, LA Bar No. 37819
Assistant United States Attorney

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 18, 2026, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of the filing will be sent by operation of the Court's electronic filing system to all counsel of record.

*/s/John W. Nickel*